COMMONWEALTH of Pennsylvania,
Appellant,

v.

Wilfredo SANTIAGO, Appellee.

Superior Court of Pennsylvania.

Argued Dec. 3, 2002.
Filed March 10, 2003.
Reargument Denied May 13, 2003.

William G. Young, Asst. Dist. Atty., Philadelphia, for Com., appellant.

David Rudovsky, Philadelphia, for appellee.

BEFORE: JOYCE, BENDER and BECK, JJ.

OPINION BY JOYCE, J.:

¶ 1 The Commonwealth appeals from the order entered September 14, 2001 by the Court of Common Pleas of Philadelphia County which granted Wilfredo Santiago's motion to suppress and his motion in limine. We affirm in part and reverse in part. The relevant facts and procedural history have previously been summarized by this Court as follows.

On May 28, 1985, at or about 3:00 a.m., the body of Police Officer Thomas Trench was found in his patrol car at the corner of 17th and Spring Garden Streets in Philadelphia. He had been shot in the face and in the left side of the neck at close range. An intensive investigation was begun by the Philadelphia Police Department to apprehend his murderer. During the early hours of this investigation, it was learned that Wilfredo Santiago had participated in a neighborhood altercation on the evening prior to the murder, during which he had been observed by civilian and police witnesses to be in possession of a handgun. When police had attempted to intervene in the dispute, Santiago had fled and had been pursued by police to the home of his aunt, Carmen Geigel, where he was residing at the time. An altercation had ensued between police and members of Santiago's family in which Santiago's aunt and his cousin, Manuel Roldan, had attempted to prevent police from arresting Santiago. Both Santiago and Roldan had been taken into police custody, but Santiago had been released after giving police an alias which had prevented their learning that he had been on parole at the time. Upon being released from police custody, Santiago had made threats against Police Officer Ismael Cruz, whom Santiago believed had used excessive force against him and his family. Officer Cruz had been assigned to the same patrol car, number

912, in which Officer Trench was later found murdered.

On the afternoon following the murder of Officer Trench, Santiago was re-arrested and charged in connection with the altercation in which he had been involved on the prior evening. Pursuant to a request by the District Attorney's Office bail was set at $75,000. Unable to make bail, Santiago remained incarcerated, and, on several occasions, was questioned by police regarding possible involvement in the murder of Officer Trench. During each interrogation, Santiago gave an exculpatory statement in which he denied any involvement in the killing. However, on June 27, 1985, while being questioned by police, Santiago admitted to having had a .38 caliber revolver, the same type of gun which had been used in the shooting of Officer Trench. Santiago claimed, however, that he had sold the gun two weeks before the Trench shooting. On July 23, 1985, Santiago was charged in connection with the murder of Officer Trench.

On August 1, 1985, the Commonwealth sought and obtained a protective order which prevented the defense from examining the affidavit of probable cause for the warrant to arrest Santiago for murder. The court also ordered that the affidavit be sealed until further court order. This order remained in effect until April 21, 1986, then the trial court lifted the protective order and directed the Commonwealth to make appropriate discovery information available to the defense. Thereafter, a suppression hearing was held from April 23, 1986 until June 6, 1986, following which the trial court refused to suppress statements made by Santiago to police and to prison inmates. Also not suppressed were physical evidence seized by police and certain intercepted wire communica-

tions. The trial court, however, did order that intercepted communications between Santiago's aunt and her husband be suppressed.

Following jury selection, trial commenced on July 14, 1986. The Commonwealth presented evidence of Santiago's involvement in the earlier neighborhood altercation and his threats to police on the evening prior to Officer Trench's murder. Evidence was also introduced that Santiago had been seen riding a bicycle near the scene of the shooting within an hour of the crime. One witness, Jose Rosario, testified that Santiago while riding his bicycle prior to the shooting, had dropped a handgun which he had been carrying concealed in a newspaper and had to stop to retrieve it. Santiago also had been observed, approximately ten minutes after the shooting, riding north on 17th Street, away from the murder scene. Evidence was also presented that Santiago had been observed with a .38 caliber handgun during the weeks preceding the murder of Officer Trench. Finally, there was evidence that Santiago had made statements to two inmates in which he had admitted killing Officer Trench, and that he had told a third inmate that he was not worried about the police finding the gun.

* * *

On August 5, 1986, after hearing all of the evidence, the jury found Santiago guilty of first degree murder and possession of an instrument of crime. On the following day, the penalty phase of the trial commenced, and the jury fixed Santiago's sentence for first degree murder at life imprisonment.

On August 7, 1986, Santiago filed post-trial motions for a new trial and/or in arrest of judgment. Supplemental and amended post-trial motions were also filed on Santiago's behalf. An en banc panel of the Philadelphia Court of Common Pleas was convened on October 19, 1987 to hear argument on Santiago's post-trial motions, but, on June 23, 1988, post-trial relief was denied. Santiago was then formally sentenced to life imprisonment for first degree murder and to serve a concurrent term of imprisonment for not less than two and one-half (2½) years nor more than five (5) years for possession of an instrument of crime. An appeal was thereafter filed in the Superior Court, and that Court following argument before a court en banc, reversed the judgment of sentence and granted a new trial on grounds that: (1) police had violated Santiago's Fifth Amendment right to counsel by continuing to question him after he had requested counsel, even though counsel had been appointed to represent him; and (2) the trial court had violated Santiago's due process rights by failing to disclose to the defense exculpatory evidence which the court had obtained during an in camera interview with a key Commonwealth witness prior to trial, which interview had been held without the presence of defense counsel or the prosecutor. See: *Commonwealth v. Santiago*, 405 Pa.Super. 56, 591 A.2d 1095 (1991) (en banc). A petition for allocatur was denied by the Pennsylvania Supreme Court on December 17, 1991. See: *Commonwealth v. Santiago*, 529 Pa. 633, 600 A.2d 953 (1991).

Upon remand to the trial court, Santiago, on March 17, 1992, filed a motion for pre-trial discovery in which inter alia, he requested "[a]ny evidence favorable to the Defendant which is material to the issue of guilt or punishment, or which bears upon or could reasonably weaken or affect the credibility of any evidence proposed to be introduced against the Defendant by the Common-

wealth, or which bears in any material degree on the charges against the Defendant." In its reply, the Commonwealth responded that such information had "already [been] exhaustively provided." Thereafter, several hearings were held upon Santiago's discovery requests, during which the Commonwealth was ordered to disclose the daily police activity reports pertaining to the investigation of Officer Trench's murder. Ultimately, the Commonwealth was ordered also to disclose to the defense all statements of persons interviewed by police in connection with the murder of Officer Trench. On July 13, 1992, after receiving statements from the Commonwealth which had not been disclosed prior to his initial trial, Santiago filed a motion to dismiss all charges on grounds that his constitutional right to due process and principles of double jeopardy had been violated by the Commonwealth's intentional and deliberate withholding of material, exculpatory evidence. Specifically, Santiago alleged that the Commonwealth had withheld nineteen items of evidence which would have been admissible to: (1) demonstrate that there were other possible perpetrators of the crime; (2) impeach the testimony of key prosecution witnesses; and (3) undermine essential aspects of the Commonwealth's theory of the case.

A hearing was held on Santiago's motion to dismiss on September 29, 1992; and, on October 15, 1992, in a ruling issued from the bench, the trial court granted Santiago's motion and ordered that he be discharged.... The Commonwealth appealed.

*Commonwealth v. Santiago*, 439 Pa.Super. 447, 654 A.2d 1062, 1065–1068 (1994).

¶ 2 This Court reversed the dismissal of Santiago's charges and remanded the case after concluding that (1) the evidence withheld by the prosecution was either not exculpatory or nonmaterial to the defense and thus the lack of disclosure did not violate *Brady v. Maryland*[1], and (2) the prosecutor's failure to disclose certain evidence to the defense, even if the result of an intentional decision rather than a mere oversight, did not bar retrial of the defendant under the double jeopardy clause absent evidence of bad faith or specific intent to deny the defendant of a fair trial. *Santiago, supra*, 654 A.2d at 1063. Both a petition for allocatur and a petition for writ of certiorari were subsequently denied. *Commonwealth v. Santiago*, 541 Pa. 651, 664 A.2d 540 (1995) (table) and *Santiago v. Pennsylvania*, 516 U.S. 995, 116 S.Ct. 532, 133 L.Ed.2d 437 (1995). Santiago also filed a writ of habeas corpus with the United States District Court for the Eastern District of Pennsylvania wherein he claimed his re-trial would violate double jeopardy principles. That Court concluded that the cumulative effect of the nondisclosed evidence could have caused a different verdict at trial but denied the petition since Santiago was already awarded a new trial and because he had failed to prove that the Commonwealth intentionally withheld the evidence to avoid an acquittal.

¶ 3 On remand, the case was reassigned to the Honorable David N. Savitt. Santiago filed another suppression motion, seeking to preclude the testimony of ten previously undisclosed witnesses, to exclude the testimony of one Denise Jackson, and to bar any evidence relative to his November 18, 1997 guilty plea for assault charges. Judge Savitt granted Santiago's motion in most respects and the Commonwealth ap-

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

pealed.[2] This Court affirmed the trial court's order. *Commonwealth v. Santiago*, 742 A.2d 211 (Pa.Super.1999) (table) and the Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Santiago*, 563 Pa. 685, 760 A.2d 853 (2000)(table).

¶ 4 The case proceeded again in the court of common pleas where Santiago filed yet another motion in limine seeking to prevent the Commonwealth from introducing evidence regarding his prior crimes and possible motives for the murder of Officer Trench. He also sought a ruling precluding the admission of evidence that he changed travel plans without advising his parole officer shortly after the murder and that he had used an alias. Lastly, Santiago moved to admit the statements of three witnesses and to admit into evidence the Commonwealth's *Brady* violations in an effort to show the weakness of the Commonwealth's case. A hearing was held on this motion along with Santiago's previously filed suppression motion wherein he sought to exclude the inculpatory statements he made to prison inmates Howard Long and Frank McAleese. The Honorable Carolyn Temin (hereinafter the trial court) presided over the hearings and, on August 1, 2001 issued an order: excluding evidence of Santiago's prior bad acts; preventing the Commonwealth from introducing evidence of Santiago's motive to murder Officer Trench; allowing evidence of Santiago's trip being rescheduled to be admitted but excluding evidence that Santiago failed to inform his parole officer of the change; allowing the testimony of three witnesses; excluding evidence of Santiago's use of an alias; and suppressing the confessions Santiago made to Long and McAleese. The trial court deferred

its ruling on the Commonwealth's alleged *Brady* violations until time of trial. The Commonwealth filed a motion to reconsider therein raising for the first time the doctrine of the law of the case as it pertained to the suppression of Santiago's confessions since Judge Durham had previously ruled on this issue in 1986. The trial court granted the Commonwealth's motion as to Santiago's use of an alias but otherwise denied relief. This appeal followed.

¶ 5 The Commonwealth raises the following issues for our consideration:

I. [Whether] the lower court erred by suppressing [Santiago's] confessions to other prison inmates when another judge of coordinate jurisdiction already denied his suppression motion on identical grounds, and, where, in any event, at the time he made those statements, [Santiago] was neither in custody on the murder charge to which he confessed, nor was he subjected to custodial interrogation regardless of whether the inmates he was talking to were secretly acting as police agents.

II. [Whether] the lower court erred by precluding the Commonwealth from introducing evidence to show consciousness of guilt by establishing that [Santiago] did not, as the conditions of his parole required, obtain the permission of his parole officer before changing travel plans to leave the jurisdiction immediately after the murder.

III. [Whether] the lower court erred by ruling that [Santiago] will be allowed to introduce at trial hearsay statements on the theory that the statements were withheld by the Commonwealth in violation of *Brady v. Maryland;* the statements do not satisfy any recognized

---

**2.** Judge Savitt did not rule on the admissibility of the testimony of McAleese or Long, who are the prison inmates to whom Santiago made inculpatory statements and are one of the subjects of this appeal.

hearsay exception and this Court has already conclusively ruled at an earlier stage of the case that no *Brady* violation occurred with respect to any of these statements.

IV. [Whether] the lower court erred by deferring until trial its ruling on [Santiago's] request to relitigate purported *Brady* violations already rejected by this Court in 1994.

Brief for the Commonwealth, at ii (capitalization omitted).

¶ 6 The Commonwealth first contends that the trial court erred in considering Santiago's suppression motion regarding the admissions he made to two prison inmates when the issue had previously been ruled upon by Judge Durham in 1986. Santiago refutes this argument under two theories. First, Santiago maintains that the Commonwealth waived this argument because it did not object on this basis at any time prior to or during the suppression hearing. Indeed, it was only after the trial court issued its decision on the suppression issue did the Commonwealth raise the law of the case doctrine in a motion to reconsider. Secondly, Santiago avers that the trial court properly considered the issue since the law upon which the issue revolves had changed since Judge Durham's 1986 order and that new and dispositive facts came to light that Judge Durham did not have the benefit of considering.

¶ 7 In turning first to Santiago's waiver argument, we do not agree that the

Commonwealth's tardiness in raising the issue in its motion to reconsider results in waiver. Generally, issues not raised in the lower court are waived and cannot be raised for the first time on appeal. *Commonwealth v. Baker*, 556 Pa. 427, 728 A.2d 952, 953 (1999); Pa.R.A.P. 302. "One of the main purposes of the waiver doctrine is to ensure that the appellate court is provided with the benefit of the trial court's reasoning." *Commonwealth v. Metz*, 534 Pa. 341, 633 A.2d 125, 127 n. 3 (1993). Courts have declined to find waiver, even where the objection was not made in a procedurally proper manner. *Metz*, 633 A.2d at 127 (waiver not found where the appellant raised an issue in a post-trial motion and the trial court chooses to overlook the defect and address the issue on its merits).

¶ 8 Presently, the trial court did, in fact, have an opportunity to consider the issue of the law of the case doctrine. The trial court analyzed the application of the doctrine as set forth in its Pa.R.A.P. 1925(a) opinion, thereby assisting this Court in conducting effective and meaningful review of its decision. Accordingly, because the issue was raised before the trial court and was considered by the trial court, we will not find waiver.[3][4] We will now discuss the parties' law of the case arguments.

¶ 9 The law of the case doctrine "refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another

---

3. The better practice is to raise such an issue at the earliest time possible so as not to waste judicial resources.

4. The cases cited by Santiago which state that an issue is waived if not presented in a post-trial motion are not helpful to our analysis, as they were decided prior to 1994. If a defendant was determined to be guilty prior to January 1, 1994, a post-trial motion was a

requisite to preservation of issues for appeal. Pa.R.Crim.P. 1123, 42 Pa.C.S.A.. However, this rule was modified to make the practice of post-trial motion optional, thereby eliminating the necessity of filing the motion to preserve issues. Pa.R.Crim.P. 720. Civil cases also require the filing of a post-trial motion to preserve an issue, Pa.R.C.P. 227.1(2); therefore, those cases are inapposite.

judge of that same court or by a higher court in the earlier phase of the matter." *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995).[5] This doctrine applies when a case has been remanded and mandates that the trial court may not alter a legal question decided by an appellate court in the matter. *Starr, supra,* 664 A.2d at 1331. Moreover, a defendant is not permitted to relitigate the admissibility of evidence by filing a suppression motion when the same issue was raised and decided previously. *Commonwealth v. McEnany*, 732 A.2d 1263 (Pa.Super.1999).

> The various rules which make up the law of the case doctrine not only serve to promote the goal of judicial economy (as does the coordinate jurisdiction rule) but also operate to (1) to protect the settled expectations of the parties; (2) to insure uniformity of decision; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end.... The various policies which motivated the development of these rules and which continue to motivate the enduring existence of both the coordinate jurisdiction rule and the law of the case doctrine are of paramount importance in the context of a criminal proceeding where the criminal defendant and his counsel must be allowed to proceed to trial with an established trial strategy and with the security of knowing, for example, that he either will or will not be permitted to represent himself or that his pre-trial statements either will or will not be introduced against him at trial. In this regard, these rules seek to ensure fundamental fairness in the justice system by preventing a party aggrieved by one

judge's interlocutory order to attack that decision by seeking and securing relief from a different judge of the same court, thereby forcing one's opponent to shift the focus of his trial strategy in the matter.

*Starr,* 664 A.2d at 1331.

■ ¶ 10 The law of the case doctrine does not require prophylactic application, however. A prior decision may be departed from in "exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Id.* at 1332.

■ ¶ 11 In determining that the law of the case doctrine did not apply, the trial court found that the law relied upon by Judge Durham in rendering his decision had been changed by the subsequent decisions of *Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265 (1992) and *Commonwealth v. Franciscus*, 551 Pa. 376, 710 A.2d 1112 (1996). The trial court also determined that there had been a substantial change in the facts or evidence, thereby creating an exception to the law of the case doctrine. The trial court concluded:

> Judge Durham, in accordance with the law at that time, barred questioning related to deals or benefits received by the informants and related to any leniency or benefits expected by the informants as a result of their cooperation with the Commonwealth. He heard no testimony from the informants themselves and relied on the testimony of the detective who interviewed them to conclude that neither of the informants had been re-

---

**5.** This family of rules embodies the coordinate jurisdiction rule. *Starr, supra,* 664 A.2d at

1332.

quested by the police or their agents to elicit information from the defendant. At the time he denied the motion to suppress[,] Judge Durham did not have: the testimony of McAleese at trial that he was a government agent; the note of June 5, 1985 written by Detective Nespoli in which he says, 'McAleese has Santiago talking to him', the testimony concerning the benefits received by Long after his appearance at the defendant's trial; the testimony concerning the benefits received by McAleese after his appearance at defendant's trial; or the information as to benefits provided to both informants as a result of information provided to police in cases prior to their testimony against defendant.

Trial Court Opinion, 2/19/02, at 14. We will evaluate the trial court's determination that an exception to the law of the case existed for an abuse of discretion. *Starr*, 664 A.2d at 1334.

¶ 12 At the initial suppression hearing in 1986, Judge Durham denied Santiago's motion to suppress the confessions he made to inmates Long and McAleese. In doing so, Judge Durham considered *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) and *Commonwealth v. Berkheimer*,[6] 505 Pa. 506, 481 A.2d 851 (1984). Those cases hold that the government violated the accused's Sixth Amendment right to counsel when it deliberately elicited incriminating evidence from the

accused via an agent acting on its behalf.[7] Judge Durham concluded that Long and McAleese were not acting as agents of the government when Santiago made his statements to them and, therefore, no Sixth Amendment violation occurred.

¶ 13 Six years after Judge Durham decided Santiago's suppression motion, *Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265 (1992) was decided. Moose was incarcerated on charges of rape and murder. At his trial, a fellow inmate, Sonny Oglesby testified that Moose admitted to his involvement in the rape and murder. Moose was convicted and filed a post-trial motion alleging that his Sixth Amendment right to counsel had been violated because the district attorney's office had an "implied understanding" with Oglesby that made him an agent of the government. This implied understanding was that, in exchange for supplying information regarding various inmates, the district attorney's office kept Moose in the county jail (instead of state prison) and continuously deferred his sentencing. In determining that this arrangement amounted to "deliberate elicitation" of incriminating statement in violation of Moose's Sixth Amendment rights, the Supreme Court relied on *Massiah, supra, Henry, supra* and *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).[8] The Court concluded, "[w]e believe that the facts of this case fall squarely within the prohibition of *Moulton;* the Sixth Amendment is violated

---

**6.** In *Berkheimer*, the cellmate to whom the defendant made inculpatory statements was found not to be acting as a government agent.

**7.** In *Massiah*, the agent's car was wired to record the conversation between the agent and his co-defendant and transmit it to the police; in *Henry*, the agent was a prison cellmate, paid to act as an informant and who engaged the defendant in conversation that produced incriminating evidence.

**8.** In *Maine v. Moulton, supra*, a co-defendant agreed to cooperate with the government and, to that end, wore a body wire and engaged Moulton in conversation that produced inculpatory statements. The United States Supreme Court found that this violated Moulton's Sixth Amendment right to counsel, as the co-defendant was acting as an agent of the government.

when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Moose,* 602 A.2d at 1271. Essential to the Supreme Court's conclusion were the following facts: Oglesby had been in the county jail for three years awaiting sentencing; the Commonwealth repeatedly delayed sentencing every time Oglesby provided new incriminating evidence on an inmate; and "although the district attorney may not have given Oglesby specific instruction, it is clear that Oglesby was well aware of what he had to do while in jail to get a good recommendation at his sentencing." *Id.* at 1270. Also considered was the fact that Oglesby was rewarded for his "work" with a lenient recommendation to the sentencing court on his murder charges. *Id.* The Supreme Court, however, was careful to distinguish its finding from the factual scenario where an inmate unexpectedly comes forward with information about a fellow inmate or where an inmate is a passive listener to a heartfelt confession, as these instances do not implicate the Sixth Amendment. *Id.* citing *Berkheimer, supra* and *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

¶ 14 The other case relied upon by the trial court to support its position that intervening law warranted overturning Judge Durham's prior finding was *Franciscus, supra.* That case again involved an inmate to whom Franciscus made inculpatory statements. In determining that the informant was acting as an agent for the government, our Supreme Court found that the informant had already secured an agreement from police to testify in his favor at his sentencing due to his cooperation in other cases; police had deposited money into his prison account in order to maintain an image for the informant that he had outside connections;

and that police had frequent meetings with the informant to encourage him to "obtain whatever useful information he could." *Id.* Concluding that Franciscus' Sixth Amendment rights had been violated, the Supreme Court relied on the law as set forth in *Massiah, Henry,* and *Moulton.* Noting, however, that this line of cases did not squarely decide whether a jailhouse informant who repeatedly provides information to police without specific direction from police violates an accused's Sixth Amendment rights, the Court was guided by the underlying principle that the focus is "whether the government failed in its affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking the right to counsel." *Id.* at 1119. Thus, the Supreme Court concluded that based upon the above mentioned facts, it was clear that the informant was not a passive listener but conducted a deliberate interrogation intended on evoking an inculpatory disclosure, thus violating Franciscus' Sixth Amendment right to counsel.

¶ 15 In determining whether *Franciscus* expanded the law as it pertains to an accused's Sixth Amendment right to counsel so as to allow the trial court to overrule Judge Durham's previous order, we would be remiss to ignore the following language: "[t]he line of decisions issued by the United States Supreme Court did not address the Sixth Amendment right to assistance of counsel in the context of a jailhouse informant who repeatedly provides information to police without specific direction from the police. Thus, we lack specific precedent that would be determinative of Franciscus's claim that his Sixth Amendment rights were violated." *Id.* at 1119. Clearly, this language indicates that our Supreme Court determined that it was faced with a factual scenario not yet considered by the United States Supreme

Court. Thus, under a Sixth Amendment analysis, it would have been appropriate for the trial court to conclude that an intervening change of law created an exception to the law of the case doctrine so to allow the trial court to re-examine Santiago's suppression motion.

¶ 16 The trial court overruled its former colleague's decision based on a change of law on Sixth Amendments grounds as set forth in *Franciscus*. Unfortunately, while this case may have expanded the factual context in which a jailhouse informant violates an accused's Sixth Amendment right to counsel, it did not expound on the law as it relates to an accused's Fifth Amendment right to remain silent. Despite going through a lengthy analysis of Sixth Amendment cases, the trial court mysteriously concluded that McAleese and Long "were agents of the Commonwealth at the time they elicited statements from [Santiago] and violated his **Fifth Amendment** rights in doing so." Trial Court Opinion, 2/19/01, at 13 (emphasis added). The trial court also stated that "[t]he Commonwealth may not rely on *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) to deny defendant relief. Unlike [Santiago], Perkins had waived his **Fifth Amendment** right to counsel. [Santiago] invoked his **Fifth Amendment** right during questioning in May of 1985. The Commonwealth's use of informants was an attempt to circumvent his **Fifth Amendment** rights." *Id.* at 13, n. 1 (emphasis added). Indeed, the law as set forth in *Massiah, Henry, Moulton,* and *Berkheimer, supra* is in no way applicable to a Fifth Amendment analysis. The law in that area holds that an undercover law enforcement officer or a jailhouse informant **may** question an accused without providing *Miranda* warnings if the statement was voluntary since there is no "interrogation" or "custodial detention" without violating the Fifth Amendment. *See Illinois v. Perkins*, 496 U.S. 292, 299, 110 S.Ct. 2394, 2399, 110 L.Ed.2d 243.[9] Accordingly, while there has been a change in Sixth Amendment jurisprudence, the trial court was without authority to disregard the law of the case under a Fifth Amendment analysis. Therefore, we find that the trial court abused its discretion in not applying the law of the case doctrine overriding Judge Durham's prior decision and we reverse on that ground. *See Commonwealth v. Atwell*, 785 A.2d 123, 125 (Pa.Super.2001) (abuse of discretion occurs where the law is overridden or misapplied).[10]

¶ 17 The second allegation of error raised by the Commonwealth pertains to the trial court's order which denied Santiago's motion to suppress evidence of his change of plans to leave the country but granted the motion as it pertained to his parole. Specifically, prior to

9. Moreover, we note that the statements made to Long and McAleese were made prior to Santiago's arrest on the murder charges. The Sixth Amendment is "offense specific" and only attaches once an accused has been charged with a crime. *See Illinois v. Perkins, supra* (after charges have been filed, the Sixth Amendment prevents the government from interfering with the accused's right to counsel); *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421 (1994) (no Sixth Amendment violation where government agent questioned defendant when charges had not yet been filed); *Commonwealth v. Boggs*, 695 A.2d 839, 843 (Pa.Super.1997), *alloc. denied*, 553 Pa. 686, 717 A.2d 1026 (1998) (same).

10. A substantial change in the facts or evidence may also create an exception to the law of the case doctrine. However, the trial court's finding that new evidence existed to demonstrate that Long and McAleese were acting as agents for the government is of no moment since those facts would only apply to a Sixth Amendment analysis, not a Fifth Amendment analysis.

the murder of Officer Trench, Santiago had made arrangements to travel to Puerto Rico. The Commonwealth alleges that subsequent to the murder, Santiago changed the date of his airline ticket so that he could commence his trip two days after the shooting. The trial court found that this constituted evidence of flight or a plan to flee and was therefore admissible to show consciousness of guilt. Trial Court Opinion, 2/19/02, at 4, citing *Commonwealth v. Washington*, 549 Pa. 12, 700 A.2d 400 (1997). However, Santiago also sought to preclude the Commonwealth from attempting to demonstrate that he did not inform his parole officer of the change in plans, which would constitute a violation of his parole. This evidence is relevant, the Commonwealth argues, to show a heightened consciousness of guilt and Santiago's willingness to violate his parole in order to flee the jurisdiction. The Commonwealth asserts that the ruling precluding this proffered evidence was erroneous in light of Pennsylvania case law that creates an exception to the general prohibition against introducing evidence of other crimes when "special circumstances exist which render such evidence relevant for some legitimate reason and not merely to prejudice the defendant by showing him to be a person of bad character." Brief for the Commonwealth, at 49–50, citing *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835 (1989).

As a general rule, evidence of crimes distinct from the charges being tried is inadmissible if the sole purpose of such evidence is to demonstrate the defendant's bad character and propensity to commit criminal acts. *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 434 (1994). The same evidence may be admissible in other circumstances, however. To be admissible, the evidence must have some purpose other than simply prejudicing the defendant. Some

examples of legitimate evidentiary purposes for the introduction of evidence of other crimes or criminal behavior include: motive, intent, absence of mistake or accident, a common scheme, to establish the identity of the person charged with the commission of the other crime, to impeach the credibility of a defendant's testimony, situations where a defendant used his prior criminal history to threaten or intimidate the victim, or situations where the distinct crimes were part of a chain or sequence or events which formed the history of the case and were part of its natural development. *Id.* at 434.

*Commonwealth v. Kemp*, 562 Pa. 154, 753 A.2d 1278, 1284 (2000). If evidence of other crimes is being offered for some purpose other than to prove the character of the accused, it may only be admitted "upon a showing that the probative value of the evidence outweighs its potential for prejudice." Pa.R.E. 404(b)(3). The trial court balanced these considerations and determined that the prejudicial impact of the jury learning that Santiago was on parole outweighed the probative value of this evidence. We agree with the trial court's conclusion. Initially, we note that the fact that Santiago changed his travel plans without the permission of his parole officer does not fall within one of the traditionally admissible categories. Moreover, when a jury is informed that an accused is on parole, they are being advised that the accused is a convicted criminal and that the criminal conviction was for an offense serious enough that it resulted in incarceration (since one can only be on parole after a period of incarceration). *Commonwealth v. Matthews*, 783 A.2d 338 (Pa.Super.2001). Given the high prejudicial value of this evidence balanced against its limited probative value, we do not find that the trial court abused its discretion in limiting this

evidence to the plans of flight to show consciousness of guilt and excluding reference to Santiago's parole.

¶ 18 In its third argument, the Commonwealth contends that the trial court erred in admitting the hearsay statements of three persons, Margaret Harris, Joseph Pineiro and Cecilia Spencer. These witnesses were interviewed by police the morning Officer Trench was found murdered and each provided a statement at that time. Margaret Harris lived across the street from where Officer Trench was shot and stated that at approximately the time of the shooting she heard a voice that sounded Caucasian coming from below her window followed by two or three loud sounds. Cecilia Spencer, who lived across the street from where Officer Trench was murdered, told police that she heard a gunshot followed by the sounds of somebody running north on 17th Street and then west onto Brandywine Street. Joseph Pineiro also lived near the murder scene and stated that he heard two gunshots. A minute or two later, he heard a man's voice say "come on, Lindsay, or something like that." These statements, Santiago contended, were crucial to his defense in that they contradicted the Commonwealth's theory of the case that Santiago had fled the murder scene on the bicycle he had been seen riding prior to the murder and that Santiago, who had a Hispanic accent, acted alone in murdering Officer Trench.

¶ 19 Prior to Santiago's trial in 1986, he made a motion for discovery. These three accounts, among several others, were not provided to the defense. As a result, when the defense did receive these statements pursuant to a court order for full disclosure by the Commonwealth, Santiago moved for a dismissal of the charges alleging a *Brady* violation. The trial court's grant of this motion led to the 1992 appeal. This Court found that the Commonwealth's failure to disclose these three statements, amongst others, did not constitute a *Brady* violation as the information contained therein was neither favorable nor material to Santiago's defense and not expressly exculpatory. Therefore, this Court reversed the trial court's order granting Santiago's motion to dismiss based on double jeopardy grounds.

¶ 20 Santiago's motion in limine moved to admit the statements of these three witnesses. Apparently, the purpose in seeking court approval was because the witnesses were unavailable to testify in person due to death or the defense's inability to find them. Santiago argued that if the prosecution had provided the witnesses' statements prior to his first trial, then these witnesses would have been located and called to testify at that proceeding, thus preserving their testimony to be used at the second trial. The trial court granted Santiago's motion, relying on Pa. R.E. 804(b)(6).

¶ 21 Pa.R.E. 804(b)(6) provides that when a witness is unavailable, their statement will not be excluded by the hearsay rule if the "[s]tatement [is] offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Although this rule of evidence is relatively new to Pennsylvania (effective October 1, 1998), it is identical to its federal counterpart F.R.E. 804(b)(6). *See* Comment to Pa.R.E. 804(b)(6). Traditionally, the rule has been applied by federal courts to prevent a defendant who has procured the absence of an adverse witness by intimidation or physical assault from subsequently arguing that the evidence previously provided by this witness

must be withheld from the finder of fact.[11] Although there is little application of Pa. R.E. 804(b)(6) by Pennsylvania courts thus far, it is clear that the two cases that have discussed the Rule have read the language plainly to mean that the exception applies only when a party's wrongdoing is done with the intention of making the declarant unavailable to testify as a witness. *See Commonwealth v. Laich,* 566 Pa. 19, 777 A.2d 1057, 1062 n. 4 (2001) (victim's out-of-court statement was not admissible under forfeiture by wrongdoing exception to the hearsay rule when defendant murdered victim not to prevent her from testifying but because of personal animosity); *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 310 n. 10 (2002).

¶ 22 In applying Pa.R.E. 804(b)(6), the trial court found that the Commonwealth's failure to provide these statements to the defense prior to the first trial constituted a *Brady* violation. The trial court reasoned:

> The Commonwealth's theory of the case was that the defendant committed the killing and left the scene on his bicycle. The evidence presented by the Commonwealth was entirely circumstantial and presented almost completely in the form of prior inconsistent statements admitted as substantive evidence under *Commonwealth v. Brady,* 510 Pa. 123, 507 A.2d 66 (1986). There were no eyewitnesses to the killing presented at the trial, no one saw the defendant fleeing from the scene of the shooting and no weapon was found on or near the defendant. Cecelia Spencer's statement that she heard someone running contradicts the Commonwealth's theory that Santiago fled on a bicycle; Margaret Harris'

statement is evidence that someone other than Santiago committed the murder because Santiago spoke with a marked Hispanic accent at the time of the killing and Joseph Pineiro's statement is evidence that someone other than the defendant may have participated in the killing. In light of the wholly circumstantial nature of the Commonwealth's case, these statements, taken together, present a substantial contradiction to the Commonwealth's theory of the case that the defendant committed the killing alone and fled the scene on a bicycle. Thus, there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Although these statements constitute hearsay, they are collectively *Brady* material which the Commonwealth wrongly withheld from the defense.

Trial Court Opinion, 2/19/02 at 10.

¶ 23 Obviously, the trial court's assessment of the witnesses' statements is in direct contradiction with this Court's 1994 holding where we found that these statements were **not** favorable, material, or exculpatory and that no *Brady* violation occurred. *Santiago,* 654 A.2d at 1081. The trial court justified its disregard of this Court's holding and the law of the case doctrine, discussed *supra,* by finding that our analysis only focused on each individual piece of evidence and made no finding on whether the cumulative evidence effected the outcome of the trial. Trial Court Opinion, 2/19/02, at 7–8. The trial court relied on *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) for

---

**11.** *See,* e.g. *United States v. Aguiar,* 975 F.2d 45, 47 (2nd Cir.1992) (silence procured through threats against potential witness); *United States v. Potamitis,* 739 F.2d 784, 788 (2nd Cir.1984) (silence procured through threats); *cert. denied,* 469 U.S. 934, 105 S.Ct.

332, 83 L.Ed.2d 269 (1984); *Steele v. Taylor,* 684 F.2d 1193, 1199 (6th Cir.1982) (silence procured because witness "under control" of defendants), *cert. denied,* 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983).

support. This case held that in order to determine whether evidence is material to establish a *Brady* violation, the evidence must be considered collectively. However, when this Court considered Santiago's *Brady* allegations, we were well aware of our obligation to look at the evidence in whole. *See Santiago,* 654 A.2d at 1070 ("in determining the materiality of evidence withheld by the prosecution under *Brady v. Maryland, supra,* an appellate court must 'view the suppressed evidence's significance in relation to the record as a whole' "); ("when multiple nondisclosures are alleged, 'the effect of each nondisclosure must not only be considered alone, for the cumulative effect of the nondisclosure might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently 'material' to justify a new trial' "). Hence, this Court was perfectly cognizant of its obligation to consider whether the cumulative effect of the nondisclosures would have required a reversal, and though not expressly, concluded that they did not. *Kyles* did not announce an intervening change of law that would create an exception to the law of the case doctrine and allow the trial court to disregard this Court's conclusions.[12]

¶ 24 Aside from the fact that the trial court disregarded this Court's prior holding in Santiago's case, its application of Pa.R.E. 804(b)(6) is flawed for a more fundamental reason. The language of the Rule requires that the party against whom the statement is offered acted *wrongfully and* that the wrongful conduct

was *intended* to, and did in fact, procure the unavailability of the declarant as a witness. We are cognizant of the fact that in determining whether a *Brady* violation exists, the good or bad faith of the prosecution is immaterial. *Santiago,* 654 A.2d at 1068, *citing Brady v. Maryland, supra.* However, in addressing the trial court's dismissal of Santiago's case we expressly found that "even if we were to assume that some or all of the nondisclosed information was withheld in violation of *Brady,* we can find no evidence of record that the prosecution acted in bad faith or that is possessed a specific intent to deny Santiago a fair trial." *Id.* at 1085. Thus, even if this Court's prior determination that the statements of Harris, Spencer, and Pineiro were not material, favorable or exculpatory was somehow overruled by *Kyles* or the federal district court's decision so to allow the trial court to be "free to consider the materiality of the three statements in light of the evidence presented at Santiago's trial," it still found wrongful behavior where we previously did not. Moreover, the trial court opinion is devoid of any facts or conclusions as to how the Commonwealth's supposed *Brady* violations were done with the *intent* of procuring the unavailability of the witnesses. The reasoning engaged in by the trial court in order to come to its conclusion is wholly inconsistent with the application of the Rule by the federal courts. Thus, we conclude that it was an abuse of discretion for the trial court to admit the statements of the three witnesses based on an application of Pa.R.E. 804(b)(6).[13]

12. The trial court also relied on the United States District Court's conclusion that the cumulative effect of the non-disclosed evidence could have caused a different verdict to find an exception to the law of the case doctrine. However, that Court also concluded that Santiago had failed to prove that the Commonwealth intentionally withheld evidence to avoid an acquittal. This latter conclusion is

consistent with our following discussion and also supports a reversal of the trial court's application of Pa.R.E. 804(b)(6).

13. Santiago also asserts in his brief that he is entitled to have these statements admitted due to his fundamental constitutional right to present a defense. However, in light of our prior determination that the statements are

¶ 25 Lastly, the Commonwealth alleges that the trial court erred in deferring its ruling on Santiago's request that he be able to introduce into evidence the of Commonwealth's deliberate withholding of evidence. The trial court opinion states that the order is not ripe for appellate review. We agree. There is no order deciding this issue one way or the other that we are able to review. In fact, the trial court could rule in the Commonwealth's favor. Presenting this issue on appeal is simply a back-door attempt by the Commonwealth to have this Court rule on an issue not yet decided by the trial court.[14] Thus, this issue is patently meritless.

¶ 26 The order of the trial court is reversed in part and affirmed in part. The case is remanded and jurisdiction is relinquished.

¶ 27 BECK, J., files Concurring Statement.

## CONCURRING STATEMENT BY BECK, J.:

¶ 1 I agree with the majority and join all parts of its well-reasoned opinion. I would add, however, that the issue regarding appellant's request to offer evidence that the Commonwealth withheld exculpatory evidence appears to be moot.

¶ 2 First, in light of the majority's resolution of this case, specifically its analysis under Rule 804(b)(6), the evidence is not admissible. Second, the premise for presenting evidence of the Commonwealth's

conduct is flawed. The trial court characterized the issue in the following manner:

> This court cannot decide whether the defendant is entitled to present evidence that the Commonwealth withheld exculpatory evidence with the intent to convict the defendant on less than a full and complete factual basis until the Commonwealth's case has been presented.

Trial Court Opinion, 2/19/02, at 15.

¶ 3 As the majority notes, our prior opinion explicitly held that the failure to turn over the statements at issue did not constitute a *Brady* violation. We further held that there was no wrongful conduct on the part of the Commonwealth. Therefore, appellant simply cannot argue that the Commonwealth withheld exculpatory evidence.

---

not material, favorable or exculpatory, we find this argument to be without merit.

**14.** Moreover, the Commonwealth, in order to be allowed to take an interlocutory appeal pursuant to Pa.R.A.P. 311(d), certified in good faith that this ruling terminated or substantially handicapped its prosecution. How this assertion can be made is completely beyond

the dictates of logic and the Commonwealth's obligation to act as an officer of the court. This is yet another example of the abuse of the *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985) rule that has given the Commonwealth a sense that it can *carte blanche* appeal any ruling that is adverse to it, simply by uttering a few magic words.