J-A28012-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LAMAR OGELSBY | |
| Appellant | No. 3048 EDA 2013 |

Appeal from the Judgment of Sentence June 18, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005339-2012

BEFORE:  GANTMAN, P.J., WECHT, J., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED NOVEMBER 25, 2014**

Appellant, Lamar Ogelsby, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for first degree murder and criminal conspiracy.[1]  We affirm.

The relevant facts and procedural history of this appeal are as follows.

> On December 24, 2006, at approximately 3:00 a.m., Officer Tyrone Harding of the Police Department of the University of Pennsylvania was patrolling his district when he heard gunshots, and then a woman screaming.  He drove toward the sounds and found the woman on the 3900 block of Market Street.  The woman, Tamia Hill, was standing next to a prone and unresponsive male named Robert Rose [("Victim")], who was bleeding profusely from a wound in his chest.  [Victim] was lying in the bike lane on the south side of Market Street.  [Victim] subsequently died from his wounds.

---

[1] 18 Pa.C.S.A. §§ 2502(a), 903, respectively.

Philadelphia Police Officer Kenneth Bolton was called to secure the scene, where he found several shell casings in .45 and 9mm calibers. The casings were on the surface of Market Street. A total of eight .45 ACP fired cartridge casings were found at the scene of the shooting, along with thirteen 9mm Luger fired cartridge casings.

Khalif Hill lived at 3962 Market Street and knew [Victim] through his cousin, Tamia Hill. At the time of the shooting, Tamia Hill lived at 3950 Market Street, across the courtyard from Khalif Hill, and was dating [Victim]. Khalif Hill knew [Appellant] as "Kool-Aid." Immediately after the shooting, he came out of his residence and saw Tamia Hill and his cousin Troy Hill standing over [Victim]. He stayed outside for a few minutes, but left when the police and emergency vehicles began to arrive.

Approximately one week later, Khalif Hill was questioned by members of the Homicide Division of the Philadelphia Police Department. He did not give a statement, but on September 30, 2010, almost four years later, he was arrested in connection with narcotics, and was again taken to the Homicide Division, at which time he told the police that he had seen the shooting, and that he had seen the two men who shot [Victim] fleeing the scene. At that time, he told police that two men he knew as Mike and Kool-Aid shot [Victim], and that Mike held a black gun and Kool-Aid held a machine-gun style weapon with two hands. He identified Michael Gibbons and [Appellant] as the two shooters. He also said that Troy Hill told him that Mike and Kool-Aid had killed [Victim]. He said that Troy also told him that [Victim] had bought a car from Kool-Aid but the transmission failed, and that because Kool-Aid was unwilling to give [Victim] his money back, he shot him instead. At trial, Khalif said that he had not actually witnessed the shooting or heard the shots and he did not see Mike and Kool-Aid leave the scene, but that otherwise his statement was truthful. He also said that he did not want to testify, and that he was nervous to do so because it could be dangerous.

Khalif Hill was held as a material witness in this case, due to the fact that he had tried to avoid giving testimony at

J-A28012-14

the preliminary hearing and had actively evaded Commonwealth attempts to secure his testimony during the weeks prior to trial. He testified that [Appellant's] uncle and another man broke into his house with a gun in the months before trial, robbed him, and asked him why he took the stand. He also testified that Michael Gibbons had encountered him a week before trial in the basement of the Criminal Justice Center and had asked him to change his testimony.

Tamia Hill was dating [Victim] at the time of his death, and she was with him the day that he saw a Pontiac Bonneville for sale and asked [Appellant] about the car. [Victim] decided to buy it, so they retrieved $3,500.00 in order to purchase it. Later, when she went with [Victim] to transfer the title, she saw [Appellant's] name on the old title. They transferred the title into her name.

On the morning of December 23, 2006, Tamia Hill and [Victim] had discussed the car and the issues that they were having with its performance. Later that evening, she heard [Victim] preparing to leave the house, and [Victim] asked her brother, Troy Hill, to walk out with him because the car was acting up. Shortly thereafter, she heard gunshots and went outside to find [Victim] lying in the street.

After the shooting, Tamia Hill accompanied detectives to the Homicide Division, where she gave a statement. She gave a second statement on February 25, 2007, in which she first mentioned the trouble with the Bonneville. She had never seen the car again after the shooting and she…reported it stolen.

Troy Hill, Tamia Hill's brother, had sold drugs for [Appellant] in 2007 or 2008. He worked with a runner named Nate, who was responsible for taking daily proceeds to [Appellant] or Michael Gibbons. He saw [Victim] outside in the street on the night of the shooting, calling [Appellant's] name and complaining loudly about the Bonneville. He then saw [Victim] approach local drug dealers who were, at that time, working with Nate; [Victim] smacked them several times, reached into their pockets, and took money from them.

- 3 -

Troy Hill knew that [Victim] was high on ecstasy and tried to calm him down, but [Victim] would not be deterred, and after robbing the drug dealers he came back inside the Hill residence and then left again in search of the Bonneville. Hill went with him, but as soon as they went outside he saw [Appellant] and Gibbons running toward [Victim]. [Appellant] told Gibbons "hit that nigga," and both of them fired on [Victim]. [Victim] tried to run, but collapsed from his wounds….

Troy Hill did not talk to authorities about what he had seen, because he did not want to endanger his mother, who lived in the housing development at the scene of the shooting. In May of 2009, while he was in federal custody pending trial in two robberies, he spoke with federal prosecutors and an FBI agent. During his proffer, he said he witnessed this murder. At that time, his family had moved and would presumably no longer be in danger were he to say what he had seen. In August of 2009, Hill entered into a plea agreement. He received a twenty-two year sentence….

\* \* \*

Sean Harris lived at the housing development on the 3900 block of Market Street for several months during 2006 and knew [Victim] well enough to say hello to him. He also recognized [Appellant], [whom] he knew as Kool-Aid. On the night of the shooting, he was driving his intoxicated friend home in his friend's Dodge Caravan, and he parked it across Market Street from the housing development. As he was opening the door to get out of the Caravan, he heard gunshots. He immediately got back in the Caravan. When he looked out the window, he saw [Appellant] shooting at least ten times at the decedent with a large black gun, held with both hands.

Harris called 911 immediately. However, because he was scared, he stayed in the Caravan all night. It was cold, and he turned the vehicle on in order to keep warm. At a certain point, it ran out of gasoline, and his friend went to get more. At approximately 7:00 in the morning, he finally emerged from the vehicle.

- 4 -

On December 27, 2006, … Harris was approached by an officer from the University of Pennsylvania's Police Department. The officer asked him if he was okay, and he said that he was not, and that he had not slept since he saw [Victim's] murder. When the officer entered Harris' information, he told Harris that there was an outstanding warrant for his arrest, and took him into custody. He was taken to the Homicide Division of the Philadelphia Police Department and interviewed by detectives about the murder.

Initially, Harris told the detectives what happened but identified a different person as the shooter because he was afraid of reprisal if he identified [Appellant]. Later, he felt guilty about identifying the wrong person, and in January of 2012, while he was in custody on another matter, he was again taken to talk to detectives about this murder. He explained to them that he did not identify [Appellant] in 2006 because he was afraid for his own safety, but that in all other respects, his prior statement was correct. He confirmed that [Appellant] is the man he saw shoot [Victim]. The Commonwealth did not offer him anything in consideration for his testimony, though he did testify that he had hoped that the detectives he spoke to would help him with his case.

(Trial Court Opinion, filed October 29, 2013, at 2-5, 6-7) (internal footnotes and citations to the record omitted).

Police arrested Appellant in Los Angeles, California on March 16, 2012. Following trial, a jury convicted Appellant of first degree murder and conspiracy. On June 18, 2013, the court sentenced Appellant to life imprisonment without parole for the murder conviction, plus a concurrent term of twenty (20) to forty (40) years' imprisonment for the conspiracy conviction.

Appellant timely filed a post-sentence motion on June 19, 2013. In it,

Appellant claimed the verdict was against the weight of the evidence. On June 20, 2013, Appellant filed a supplemental post-sentence motion, raising multiple claims of prosecutorial misconduct. The court denied Appellant's post-sentence motions on September 12, 2013.

Also on September 12, 2013, Appellant timely filed a notice of appeal. On September 13, 2013, the court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b). Appellant timely filed a Rule 1925(b) statement on October 4, 2013.

Appellant now raises five issues for our review:

> DID THE TRIAL COURT ERR IN ALLOWING THE PROSECUTOR TO CROSS-EXAMINE APPELLANT CONCERNING HIS RUMORED INVOLVEMENT IN AN UNCHARGED MURDER WHEN THE DEFENSE WAS PROVIDED WITH NO NOTICE OF ANY INTENT TO CONFRONT APPELLANT WITH THIS UNCHARGED OFFENSE AND THE PROSECUTOR LATER ADMITTED THAT HE HAD "NO SUBSTANTIVE EVIDENCE" THAT APPELLANT ACTUALLY COMMITTED THE CRIME?

> DID THE TRIAL COURT ERR IN NOT GRANTING A MISTRIAL WHEN THE PROSECUTOR SOUGHT TO DISCREDIT THE TESTIMONY OF A DEFENSE WITNESS DURING CLOSING ARGUMENT BY DELIBERATELY MISLEADING THE JURY ON THE ISSUE OF WHETHER THE WITNESS HAD ACTUALLY BEEN SHOT BY A COMMONWEALTH WITNESS?

> DID THE TRIAL COURT ERR IN NOT GRANTING A MISTRIAL WHEN THE PROSECUTOR CLAIMED IN CLOSING ARGUMENT THAT A CELLULAR TELEPHONE CONFISCATED FROM A DEFENSE WITNESS IN THE PRESENCE OF THE JURY "CAN'T BE LOOKED AT" WHEN THE PROSECUTOR ADMITTED OUTSIDE THE PRESENCE OF THE JURY THAT HE HAD NOT "HAD THE CELL PHONE ANALYZED" AND HAD "NO IDEA" WHAT DATA WAS STORED THEREIN?

DID THE TRIAL COURT ERR IN NOT GRANTING A MISTRIAL WHEN THE PROSECUTOR REFERRED TO APPELLANT DURING CLOSING ARGUMENT AS A "MEGALOMANIAC" AND "A SHEEP IN WOLF'S CLOTHING?"

DID THE TRIAL COURT ERR IN ALLOWING THE COMMONWEALTH TO OFFER EVIDENCE OF UNCHARGED DRUG DEALING THAT OCCURRED AFTER THE COMMISSION OF THE CHARGED MURDER THAT WAS ADMITTED FOR THE OSTENSIBLE PURPOSE OF ESTABLISHING A MOTIVE FOR THE CRIME?

(Appellant's Brief at 2).[2]

In his first issue, Appellant contends the prosecutor cross-examined Appellant about his rumored involvement in the murder of an individual named Frank Trower, even though the Commonwealth did not charge Appellant with any crimes related to Mr. Trower's murder. Appellant maintains the prosecutor did not have a good faith basis for the Trower line of questioning, because the prosecutor did not have substantive evidence linking Appellant to Mr. Trower's murder. Appellant insists it is "blatantly improper for a prosecutor to ask questions which imply the existence of a

_____

[2] Appellant's statement of questions involved does not correspond to the argument section of his brief. Specifically, the argument section is divided into two parts, addressing Appellant's claims of prosecutorial misconduct and erroneous evidentiary rulings. Nevertheless, the argument section touches upon each of the issues listed in the statement of questions involved. Consequently, we address the issues in the same order in which they appear in the statement of questions. We are also mindful of the fact that Appellant maintains the prosecutor engaged in a "course of conduct" that deprived Appellant of a fair trial, and that we must consider the cumulative effect of the purported instances of misconduct.

factual predicate that cannot be proven and which attempt to create impressions of guilt through innuendo." (Appellant's Brief at 21). Moreover, Appellant claims the prosecutor compounded the error by failing to provide notice of his intent to refer to an uncharged crime, pursuant to Pa.R.E. 404(b)(3). Appellant concludes the court erred in allowing the prosecutor to ask questions concerning Mr. Trower's murder, Appellant suffered prejudice due to the questioning, and the court should have granted a mistrial on this basis. We disagree.

"A motion for a mistrial is within the discretion of the trial court." *Commonwealth v. Tejeda*, 834 A.2d 619, 623 (Pa.Super. 2003). "It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion." *Id.* (internal citations omitted). "[A] trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Bryant*, 620 Pa. 218, 238, 67 A.3d 716, 728 (2013) (quoting *Commonwealth v. Chamberlain*, 612 Pa. 107, 176, 30 A.3d 381, 422 (2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 2377, 182 L.Ed.2d 1017 (2012)).

"[I]t is improper for the prosecutor to ask questions which imply the

existence of a factual predicate and which attempt to create impressions of guilt through innuendo." ***Commonwealth v. Larkins***, 489 A.2d 837, 840 (Pa.Super. 1985). Additionally, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). "In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial." Pa.R.E. 404(b)(3).

Instantly, the prosecutor cross-examined Appellant about his relationships with certain individuals from the neighborhood near 40th and Market Streets:

> [COMMONWEALTH]: Did you know a Frank Trower?
>
> [APPELLANT]: Yes.
>
> [COMMONWEALTH]: What was your relationship with Frank?
>
> [APPELLANT]: A role model, actually.
>
> [COMMONWEALTH]: A role model?
>
> [APPELLANT]: Yes.
>
> [COMMONWEALTH]: What about Christopher Stewart?[3] Did you know him?

---

[3] One of the Commonwealth's eyewitnesses, Mr. Harris, met with police immediately after Victim's murder and identified Mr. Stewart as the shooter. *(Footnote Continued Next Page)*

[APPELLANT]:     Yes.  They're from 40th Street, yes.  It's a small community.

(*See* N.T. Trial, 6/13/13, at 247-48.)  After inquiring about other topics, the prosecutor revisited Appellant's relationship with Mr. Trower:

[COMMONWEALTH]:     Okay.  It's your testimony Christopher Stewart never told you that he was interviewed [by police] on February 1, 2012?

[APPELLANT]:     Not that I recall, no.

[COMMONWEALTH]:     Okay.  Well, four days later, do you remember Super Bowl Sunday?

[APPELLANT]:     I follow sports.  I remember the Super Bowl, yes.

*     *     *

[COMMONWEALTH]:     Do you know what happened to Frank on Super Bowl Sunday?

[APPELLANT]:     Yes.

[COMMONWEALTH]:     Okay.  What happened to Frank on Super Bowl Sunday?

[APPELLANT]:     He got murdered.

[COMMONWEALTH]:     He got murdered four days after Christopher Stewart was interviewed by Homicide detectives, right?

[APPELLANT]:     I don't know the exact [date] when he got interviewed.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

(*See* N.T. Trial, 6/12/13, at 273).  In January 2012, Mr. Harris told police he had identified the wrong person, and he actually saw Appellant shoot Victim.

[COMMONWEALTH]:          And Frank was the one that called you to let you know that [Victim] had left the house; right?

[APPELLANT]:          No.

[COMMONWEALTH]:          And when Christopher Stewart told you that Homicide had reopened the case in 2012, you ordered a hit on Frank in the courtyard at 40th and Market on Super Bowl Sunday?

[APPELLANT]:          Reopened what case?

[COMMONWEALTH]:          Reopened the investigation that you were told you were a person of interest for in February of 2007. You ordered a hit on Frank on Super Bowl Sunday last year when you found out Christopher Stewart was interviewed by Homicide about your murder.

(*Id.* at 254-56). At that point, defense counsel objected. Before counsel could elaborate, the court overruled the objection. Appellant denied ordering a hit, and the prosecutor moved on to a different line of questioning.

The next day, defense counsel moved for a mistrial "based on an accumulation of things," including the Trower line of questioning.[4] (*See* N.T. Trial, 6/14/13, at 4.) The court received argument on the matter, and the prosecutor provided his explanation for the Trower line of questioning:

_____

[4] The court questioned defense counsel about the timing of the mistrial motion. Defense counsel responded, "I'm objecting to a pattern of conduct, the accumulation of all of this. What else can you do?" (*Id.* at 28). We note this is the same claim Appellant now raises on appeal. (*See* Appellant's Brief at 14).

> I have been told through multiple sources, through word on the street, through family members of the Hills, through Troy Hill himself, that Frank was the one that put the phone call to [Appellant] in this murder, and they thought [Appellant] and his associates believed that Frank was talking. In order to silence Frank, that's why Frank was killed in the projects that night.
>
> *    *    *
>
> So it's very much underlying the mindset of the witnesses, and as I said, I've heard it from detectives, I've heard it from the street, I've heard it from family members that that is what's going on and that was the motive for that murder. So it goes to [Appellant's] consciousness of guilt.
>
> Obviously, I have no substantive evidence to argue it, and it's not evidence because questions are not evidence. His answers are evidence. But that was my good faith basis for asking those questions.

(**Id.** at 25-26). Ultimately, the court denied Appellant's mistrial motion.

Here, the court conceded that the Commonwealth failed to provide proper notice pursuant to Rule 404(b)(3). (**See** Trial Court Opinion at 10.) Nevertheless, the court noted the prosecutor's questions about the Trower murder did not amount to evidence, and the jury was instructed as such. **See Commonwealth v. LaCava**, 542 Pa. 160, 182, 666 A.2d 221, 231 (1995) (holding attorneys' statements or questions at trial are not evidence). Additionally, the court concluded:

> [T]he Trower line of questioning was limited both in duration and…in its impact. Given the significant quantity of evidence against [Appellant] and the brief extent and unsubstantiated nature of the Trower line of questioning, [the c]ourt finds it impossible to conclude that it had any impact on the verdict.

- 12 -

(**See** Trial Court Opinion at 11.) In light of the applicable standard of review, we accept the court's decision that the Trower line of questioning did not have the unavoidable effect of depriving Appellant of a fair trial by preventing the jury from weighing and rendering a true verdict. **See Bryant, supra**. Thus, Appellant is not entitled to relief on his first issue.

In his second and third issues, Appellant asserts the Commonwealth presented eyewitness testimony from Troy Hill. Appellant theorizes, however, that Troy Hill was actually involved with Victim's murder and had a motive to accuse Appellant of the crime. In support of his theory, Appellant offered trial testimony from his friend, Khalil Gardner, who claimed Troy Hill shot Mr. Gardner with a .45 caliber firearm in June 2007.[5] During Mr. Gardner's testimony, Appellant presented "a blowup of a screenshot from Gardner's cell phone," showing a threatening text message sent by Troy Hill's cousin, Khalif Hill. (Appellant's Brief at 32). Appellant later testified that the purported shooting of Mr. Gardner resulted in a physical altercation between Appellant and Troy Hill, and Appellant "got the better of the fight." (**Id.**) (quoting N.T. Trial, 6/13/13, at 222).

Appellant now argues that the prosecutor made false representations to attack Mr. Gardner's credibility during closing arguments. Specifically, Appellant contends the prosecutor informed the jury that Mr. Gardner's cell

---

[5] On cross-examination, Troy Hill denied shooting Mr. Gardner. (**See** N.T. Trial, 6/12/13, at 119.)

- 13 -

phone was dead; thus, the Commonwealth could not verify whether Mr. Gardner received the threatening text message from Khalif Hill. Appellant complains the prosecutor later admitted that the Commonwealth had yet to check the phone, even though the Commonwealth obtained the phone during trial. Further, Appellant claims the prosecutor implied that Mr. Gardner had lied about Troy Hill, because the defense did not present a police report concerning the shooting of Mr. Gardner. Appellant emphasizes the prosecutor later admitted he actually had a copy of the police report documenting Mr. Gardner's shooting. Under these circumstances, Appellant argues the prosecutor improperly misled the jury. Appellant concludes the court should have granted his motion for a mistrial due to these instances of prosecutorial misconduct. We disagree.

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Harris*, 884 A.2d 920, 927 (Pa.Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007).

> In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.
>
> Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [the defendant] so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct, however,

- 14 -

> will not be found where comments…were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made. Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury.

*Harris, supra* at 927.

"A prosecutor has great discretion during closing argument. Indeed, closing 'argument' is just that: argument." *Commonwealth v. Brown*, 911 A.2d 576, 580 (Pa.Super. 2006), *appeal denied*, 591 Pa. 722, 920 A.2d 830 (2007). "[T]he prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom…." *Commonwealth v. Hogentogler*, 53 A.3d 866, 878 (Pa.Super. 2012), *appeal denied*, 620 Pa. 720, 69 A.3d 600 (2013) (quoting *Commonwealth v. Judy*, 978 A.2d 1015, 1019-20 (Pa.Super. 2009)).

Instantly, Troy Hill testified that he had sold drugs for Appellant at the 40th Street townhouses in West Philadelphia between 2007 and 2008. Mr. Hill was a "street dealer" who dealt directly with buyers. (*See* N.T. Trial, 6/12/13, at 20.) Mr. Hill received drugs from a "runner" named "Nate." (*Id.*) Mr. Hill gave the proceeds of his sales to Nate, who passed the cash along to Appellant.

Mr. Hill also testified that he was at his mother's house, with Victim, on the night of the murder. At some point during the early morning hours, Victim wanted to leave the house and look for his vehicle. Mr. Hill escorted

Victim out of the house. While walking with Victim, Mr. Hill saw Appellant and Mr. Gibbons running up the street with firearms. Appellant and Mr. Gibbons opened fire on Victim, who collapsed in the street.

On cross-examination, defense counsel asked Mr. Hill about his relationship with Appellant. Mr. Hill claimed to have had a good relationship with Appellant. Defense counsel also asked Mr. Hill whether he had shot Khalil Gardner, and whether that shooting prompted an altercation with Appellant. Mr. Hill denied shooting Mr. Gardner or fighting with Appellant.

During the defense's case, Appellant presented Mr. Gardner, who testified that Troy Hill assaulted his brother in June 2007. When Mr. Gardner arrived at the scene of the assault, Troy Hill shot Mr. Gardner. Mr. Gardner said he almost died from the gunshot wound, and he was hospitalized for about one month. Mr. Gardner confirmed that police questioned him about the shooting, but he did not make a statement implicating Mr. Hill because he feared retaliation.

Further, Mr. Gardner testified that Troy Hill's cousin, Khalif Hill, sent him a threatening text message in 2012. Mr. Gardner indicated he had saved the message on his cell phone, and he had brought the cell phone with him to court. Defense counsel asked Mr. Gardner to take out his phone. Simultaneously, defense counsel started to set up an exhibit for the jury, which was an enlarged "screenshot" of the text message on the cell phone.

At that point, the court asked to see the text message. The court ordered a sidebar and instructed defense counsel to take Mr. Gardner's cell phone. Mr. Gardner responded, "My phone died." (*See* N.T. Trial, 6/13/13, at 195.) At sidebar, the prosecutor asked that the phone remain with a court officer, which the court permitted. Thereafter, the court allowed defense counsel to proceed with his questioning about the text message. Ultimately, Mr. Gardner read the text message, which stated: "Ayo ur homies are broke they on some nut shit im gonna kill one of them yall dont no me cuz. My folks shouldve killd u pussy. And yall pussys ratted on my cus." (*Id.* at 197).

The next day, the prosecutor moved to strike Mr. Gardner's testimony about the text message. The prosecutor informed the court, "[W]e haven't had the cell phone analyzed…so I have no idea what's in that cell phone from Mr. Gardner." (*See* N.T. Trial, 6/14/13, at 52.) The court denied the prosecutor's motion as follows: "I'll just point for the record it's now 10:20. That phone was taken from the witness yesterday afternoon I think at around 3:00, and I'm not going to delay the trial anymore." (*Id.* at 52-53).

During closing arguments, defense counsel repeatedly attacked Troy Hill's credibility. In response, the prosecutor addressed Appellant's attempts to discredit Troy Hill:

> So [Appellant] gets up here and he decides to come up with some bias that Troy would have had against him, right? So he presents Khalil Gardner, one of his boys, a younger boy, who gets up here and says that Troy Hill shot

me in 2007, so that [Appellant] can get up here and say, I fought him over it, so Troy Hill has a bias against me. That's where all this went.

What was the corroboration of any of that? Do we even know that Khalil Gardner was shot? How difficult is that to corroborate to even say that that happened? Do we even know what happened? **Was there a police report?** Did some police officer come in here and say they responded to it and they saw it? Or one of his friends who said they saw he was bleeding? Or maybe a medical record? I don't know. If you're shot in the belly, lift up your shirt and show us the wound. He didn't even do that.

(*Id.* at 180-81.) Later, the prosecutor again referenced Mr. Gardner: "They parachute in this witness last minute who conveniently has a cell phone that's dead, that doesn't work, that can't be looked at." (*Id.* at 182). Defense counsel immediately objected, but the court overruled the objection.

After closing arguments, defense counsel objected to the prosecutor's insinuation that Appellant could not corroborate Mr. Gardner's testimony.

But to say we can't confirm that [Mr. Gardner's] been shot…. [The prosecutor] knew when he made the statement to the jury that that's not true. He confirmed it.

(*Id.* at 190). In response, the prosecutor conceded that he had found a police report regarding the shooting of Mr. Gardner. Defense counsel then asked the court, "Are you going to correct that with the jury?" (*Id.* at 194). The court, however, declined to revisit the topic with the jury.

Subsequently, the court evaluated the prosecutor's references to Mr. Gardner as follows:

- 18 -

> Though some of [the prosecutor's] comments skirted the line of professional responsibility, they do not approach the sum of prejudice that would create the unavoidable effect of prejudicing the jury by forming in the minds of jurors a fixed bias and hostility toward [Appellant]. Further, in the context of the closing argument as a whole, the problematic comments have minimal impact and cannot be said to impinge on the fairness of [Appellant's] trial.

(**See** Trial Court Opinion at 16-17.) We accept this analysis and emphasize that the evidence regarding the connection between Troy Hill, Khalif Hill, and Mr. Gardner was, at best, subordinate to the larger question of Appellant's guilt or innocence. Thus, the court properly denied Appellant's motion for a mistrial on these bases. **See Harris, supra**.

In his fourth issue, Appellant maintains the prosecutor described him as a "megalomaniac" and a "sheep in wolf's clothing."[6] Appellant argues the prosecutor's description "was especially egregious, particularly in light of the cumulative effect of his many other transgressions." (Appellant's Brief at 37). Appellant acknowledges the court sustained defense counsel's objections to the comments, but Appellant insists the court could not remedy the prejudice he suffered. Appellant concludes the court should have granted his motion for a mistrial on this basis. We disagree.

Instantly, Appellant detailed his relationship with Troy Hill on direct examination. Appellant described Mr. Hill as "bad news in his

_____

[6] Regarding the "sheep in wolf's clothing" comment, the trial court observed, "This is what [the prosecutor] said, although it is plain that his meaning was the reverse." (**See** Trial Court Opinion at 13 n.5.)

neighborhood." (*See* N.T. Trial, 6/13/13, at 221.) Appellant also described

his interactions with Mr. Hill following the alleged shooting of Mr. Gardner:

> So after he did that to Khalil, I'm like, I approach him and asked him, like, can you, like, stop. Like, he smoke[s] weed in front of the kids. He…steal[s] people['s] car radios. He do[es] everything in his neighborhood. He's completely bad news.
>
> So I approached him about the situation of shooting Khalil, and he basically told me to mind my business and, like, was talking to me like I was a child, even though he's actually, like, 15, 12 years older than me. He told me to respect my elder and all that kind of stuff.

(*Id.*) Appellant testified that his conversation with Mr. Hill escalated into a

physical alteration, and Appellant "got the better of the fight." (*Id.* at

222).

During closing arguments, the prosecutor addressed Appellant's

testimony about Troy Hill as follows:

> [Appellant testified] I'm Mr. Peacemaker. I went up to the most violent horrible person in the neighborhood, who wreaks havoc on everyone, and I said, "Enough is enough." I said, "Gee, Mr. Troy Hill, would you please stop terrorizing the neighborhood?"
>
> Does someone who is Mr. Peacemaker, who is Mr. Professional and polite, go up to the guy that you know shoots and kills everybody and think that that's going to be a safe smart thing to do? He thinks he can get away with anything. He's a megalomaniac, this sheep in wolf's clothing. That's how desperate he is. That's how desperate he is.

(*See* N.T. Trial, 6/14/13, at 181-82.) Defense counsel immediately

objected, and the court sustained the objection.

When viewed in context, the prosecutor's comments were a fair response to Appellant's testimony. *See Hogentogler, supra*. Moreover, the use of the terms "megalomaniac" and "sheep in wolf's clothing" amounted to oratorical flair. *See Harris, supra*. On this record, Appellant's fourth issue merits no relief. Because we have denied relief on Appellant's individual assertions of prosecutorial misconduct, we also deny his generalized complaint that the cumulative effects of the purported instances of prosecutorial misconduct caused him prejudice. *See Commonwealth v. Stevens*, 559 Pa. 171, 739 A.2d 507 (1999) (stating meritless individual assertions of error lead to rejection of unfounded claim of cumulative effects).

In his fifth issue, Appellant contends the Commonwealth repeatedly introduced evidence of Appellant's involvement in drug trafficking. Appellant acknowledges the Commonwealth's theory that Appellant killed Victim in retaliation for Victim's theft of money from Appellant's drug associates. Appellant insists, however, the Commonwealth's witnesses could not demonstrate personal knowledge of a drug relationship between Appellant and the persons Victim robbed. Absent more, Appellant argues the evidence of his drug trafficking was inadmissible under Pa.R.E. 404(b). Appellant concludes the court erred in permitting the Commonwealth to introduce this evidence of Appellant's drug dealing activities. We disagree.

"Admission of evidence is within the sound discretion of the trial court

and will be reversed only upon a showing that the trial court clearly abused its discretion." ***Commonwealth v. Drumheller***, 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting ***Commonwealth v. Stallworth***, 566 Pa. 349, 363, 781 A.2d 110, 117 (2001)).

> Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.

***Drumheller, supra*** at 135, 808 A.2d at 904 (quoting ***Stallworth, supra*** at 363, 781 A.2d at 117-18).

"Evidence of prior crimes or bad acts may not be presented at trial to establish the defendant's criminal character or proclivities." ***Commonwealth v. Hudson***, 955 A.2d 1031, 1034 (Pa.Super. 2008), *appeal denied*, 600 Pa. 739, 964 A.2d 1 (2009).

> The same evidence may be admissible in other circumstances, however. To be admissible, the evidence must have some purpose other than simply prejudicing the defendant. Some examples of legitimate evidentiary purposes for the introduction of evidence of other crimes or criminal behavior include: motive, intent, absence of mistake or accident, a common scheme, to establish the identity of the person charged with the commission of the other crime, to impeach the credibility of a defendant's testimony, situations where a defendant used his prior criminal history to threaten or intimidate the victim, or **situations where the distinct crimes were part of a chain or sequence [of] events which formed the history of the case and were part of its natural development**.

> If evidence of other crimes is being offered for some purpose other than to prove the character of the accused, it may only be admitted upon a showing that the probative value of the evidence outweighs its potential for prejudice.

*Commonwealth v. Santiago*, 822 A.2d 716, 728 (Pa.Super. 2003), *cert. denied*, 542 U.S. 942, 124 S.Ct. 2916, 159 L.Ed.2d 820 (2004) (internal citations and quotation marks omitted) (emphasis added).

Instantly, Troy Hill testified that he sold drugs for Appellant between 2007 and 2008, and he was familiar with the street dealers and "runners" who worked for Appellant's drug network. Significantly, Mr. Hill also testified that he witnessed Victim assault two of Appellant's street dealers just hours before the murder. Mr. Hill explained that Victim had purchased a vehicle from Appellant, Victim believed the vehicle was defective, and Victim assaulted Appellant's associates in an attempt to recoup some of the money he had paid for the vehicle. Further, Mr. Hill stated Victim was high on drugs at the time.

The court concluded Mr. Hill's testimony about Appellant's drug dealing was admissible:

> Here, the fact that Troy Hill had sold drugs for [Appellant] helped to establish the nature and scope of [Appellant's] operation, which in turn would explain why [Victim], dissatisfied with the performance of his car and in a state of intoxicated agitation, would take money from the neighborhood drug employees of [Appellant]. Without understanding that the money he took represented sales money owed to [Appellant], Victim's act, and [Appellant's] retaliation, does not make sense. Further, it helps to establish how Troy Hill knows [Appellant], and therefore is relevant identity evidence.

- 23 -

(**See** Trial Court Opinion at 12-13.) In light of the applicable standard of review and relevant case law, the court properly permitted the Commonwealth to introduce evidence of Appellant's drug dealing, which was part of the sequence of events forming the history of the case. **See Drumheller, supra**; **Santiago, supra**. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Jenkins joins this memorandum.

Judge Wecht files a concurring memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/25/2014