J-S24005-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| H. ALLEN LITT | |
| Appellant | No. 1059 EDA 2014 |

Appeal from the PCRA Order March 7, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002280-2008

BEFORE:  GANTMAN, P.J., ALLEN, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED MAY 08, 2015**

Appellant, H. Allen Litt, appeals from the order entered in the Philadelphia County Court of Common Pleas, granting in part and denying in part his first petition brought pursuant to the Post Conviction Relief Act ("PCRA").[1]  We affirm.

The relevant facts and procedural history of this appeal are as follows.

> [Appellant] was a licensed attorney who operated a solo practice specializing in personal injury claims in Philadelphia.  To obtain business, [Appellant] utilized the services of several "runners" to recruit clients.  With [Appellant's] knowledge and encouragement, the runners often manufactured cases for the prospective clients and coached the prospective clients to lie about their accidents and injuries.

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

Three of the runners used by [Appellant] were Nathaniel Shaw and James Guinn, who specialized in slip-and-fall cases, and Joshua Pitts, who specialized in automobile accidents. For the slip-and-fall cases, [Appellant] used a procedure whereby the runners would find a plausible accident location, recruit a client to claim that he or she had been injured at that location, and then provide the recruit with a story about how the accident happened and the injuries that he or she sustained. [Appellant] taught the runners to select accident locations with visible defects, such as broken pavement or handrails, to avoid large department stores and locations with surveillance cameras, and to claim that the accidents occurred during daylight hours. For the automobile accidents, Mr. Pitts used a police scanner to listen for reports of automobile accidents and then would go to the accident site and approach the individuals involved. Mr. Pitts would suggest to the individuals involved in the accident that they should exaggerate the extent of the accident, claim to be injured, and then hire [Appellant] to pursue claims with their insurance companies.

[Appellant] encouraged the runners to take prospective clients to an emergency room to make specific complaints about the location of fake accidents and the nature of fabricated injuries. The runners would then personally accompany the client to [Appellant's] office for an interview. There, the prospective client was to recite the story of the accident and injuries as provided to them by the runners. In some cases, the runners would relay the false story of the accident themselves and [Appellant] would merely ask the client a few basic questions. [Appellant] would then recommend a doctor to the client to visit for treatment, and instruct the client that the more frequently he or she went to the doctor, the more money he or she could recover.

At some point, [Appellant] would speak to the runner privately and write out a check to the runner for his services. [Appellant] instructed the runners that the clients were not to know that he was aware that the claims were fake. If a client was required to give a sworn statement, [Appellant] would represent them at that proceeding where the client would again recite the lies

- 2 -

> concocted by the runners about the accidents and injuries. If a client's claim was successful, the insurance company would issue a settlement check to [Appellant]. [Appellant] would then issue checks to pay for the client's medical bills, other costs associated with the claim, and his own services. The remaining funds would be paid by check to the client.

(Trial Court Opinion, filed December 21, 2009, at 2-4) (internal citations to the record omitted).

Following trial, a jury convicted Appellant of six (6) counts each of theft by deception and insurance fraud, five (5) counts of attempted theft by deception, and one (1) count of dealing in proceeds of unlawful activities. On March 11, 2009, the court sentenced Appellant to an aggregate term of five (5) to ten (10) years' imprisonment. This Court affirmed the judgment of sentence on November 17, 2010. *See Commonwealth v. Litt*, 22 A.3d 1072 (Pa.Super. 2010) (unpublished memorandum). Appellant did not seek further review with our Supreme Court.

On April 13, 2011, Appellant timely filed a *pro se* PCRA petition.[2] In it, Appellant raised multiple claims of ineffective assistance of trial and direct appeal counsel. Appellant also asserted that the applicable statutes of limitations barred several of his convictions. The court appointed PCRA

---

[2] Pursuant to the prisoner mailbox rule, a document is considered filed on the date the appellant delivered it to prison authorities for mailing. *Commonwealth v. Castro*, 766 A.2d 1283 (Pa.Super. 2001). Here, the postmark attached to Appellant's *pro se* PCRA petition is dated April 13, 2011.

counsel, who filed an amended PCRA petition on October 19, 2012. On October 31, 2013, the court issued notice of its intent to dismiss the petition without a hearing, pursuant to Pa.R.Crim.P. 907. Appellant filed a response to the Rule 907 notice on January 17, 2014. On February 6, 2014, the Commonwealth filed an answer indicating it did not oppose relief regarding the convictions barred by the statutes of limitations. On March 7, 2014, the court granted PCRA relief in part, vacating Appellant's sentences for six (6) time-barred convictions. The court re-sentenced Appellant on the remaining convictions to an aggregate term of five (5) to ten (10) years' imprisonment. The court denied PCRA relief in all other respects.[3]

Appellant timely filed a notice of appeal on April 7, 2014. On April 8, 2014, the court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b). Appellant timely filed a Rule 1925(b) statement on April 29, 2014.

Appellant raises the following issues for our review:

> WHETHER THE TRIAL/PCRA COURT ERRED IN FAILING TO GRANT AN EVIDENTIARY HEARING TO DETERMINE WHETHER A VIOLATION OF APPELLANT'S 6TH AMENDMENT RIGHT TO COUNSEL UNDER THE U.S. CONSTITUTION, AND ARTICLE 1, § 9 OF THE PENNSYLVANIA CONSTITUTION OCCURRED:

---

[3] In its March 7, 2014 order, the PCRA court inadvertently failed to dispose of Appellant's ineffective assistance of counsel issues. By agreement of the parties, the court entered an order on June 27, 2014, denying all other claims raised in Appellant's PCRA petitions "*nunc pro tunc* as of 3/7/14." (Criminal Docket Entries, printed 7/14/14, at 35).

WHEN TRIAL COUNSEL FAILED TO CHALLENGE THE VALIDITY OF THE SEARCH WARRANTS ISSUED WHEN: THE WARRANTS LACKED PROBABLE CAUSE; THE WARRANTS CONTAINED ALLEGATIONS THAT WERE TOO REMOTE OR STALE TO SUBSTANTIATE CURRENT CRIMINAL ACTIVITY; WHERE THE ALLEGATIONS OF ILLEGAL ACTIVITIES WERE BEYOND THE STATUTE OF LIMITATIONS; AND WHERE WARRANTS FAILED TO ARTICULATE APPELLANT'S ALLEGED CRIMINAL CONNECTION TO THE ILLEGAL ACTIVITY?

WHEN APPELLATE COUNSEL FAILED TO RAISE IAC CLAIMS AGAINST TRIAL COUNSEL AT THE APPELLATE LEVEL WHEN TRIAL COUNSEL FAILED TO CHALLENGE THE VALIDITY OF OR DEFECTS IN SEARCH WARRANTS ISSUED THAT LACKED PROBABLE CAUSE; CONTAINED ALLEGATIONS THAT WERE TOO REMOTE OR STALE TO SUBSTANTIATE CURRENT CRIMINAL ACTIVITY; CONTAINED ALLEGATIONS OF ILLEGAL ACTIVITIES BEYOND THE STATUTE OF LIMITATIONS; AND WHERE WARRANTS FAILED TO ARTICULATE APPELLANT'S ALLEGED CRIMINAL CONNECTION TO THE ILLEGAL ACTIVITY?

WHEN TRIAL COUNSEL FAILED TO CHALLENGE THE PREJUDICIAL EFFECT OR IMPACT OF THE ADMISSION OF STALE OR REMOTE EVIDENCE PRIOR TO THE COMMENCEMENT OF TRIAL BY LITIGATING A MOTION TO QUASH, A PRETRIAL MOTION *IN LIMINE*, OR A MOTION TO SUPPRESS?

WHEN APPELLATE COUNSEL FAILED TO CHALLENGE TRIAL COUNSEL'S INACTION REGARDING THE USE OF EVIDENCE ILLEGALLY CONFISCATED FROM APPELLANT'S OFFICE, EVIDENCE ADMITTED FOR CHARGES BEYOND THE STATUTE OF LIMITATIONS PERIOD, AND THE ADMISSION OF EVIDENCE THAT WAS STALE OR TOO REMOTE TO BE RELEVANT OR MATERIAL?

WHETHER THE TRIAL/PCRA COURT ERRED IN CONCLUDING THAT STALE, REMOTE AND UNRELATED

EVIDENCE WAS ADMISSIBLE TO ESTABLISH "A CONTINUING COURSE OF CONDUCT" TO SUBSTANTIATE THE CHARGE OF DEALING IN PROCEEDS OF UNLAWFUL ACTIVITY?

WHETHER THE TRIAL/PCRA COURT ERRED IN FAILING TO FIND THAT A NEW TRIAL WAS WARRANTED WHERE THE ADMISSION OF EVIDENCE BEYOND THE STATUTE OF LIMITATION PERIOD, ILLEGALLY CONFISCATED EVIDENCE, AND STALE OR REMOTE EVIDENCE PRESENTED DURING THE TRIAL RESULTED IN AN UNFAIR TRIAL WHERE SAID EVIDENCE CONSTITUTED AN ONGOING TAINT PRESENTED TO THE JURORS DURING THE TRIAL, THAT ACTED LIKE A SNOW BALL ROLLING DOWNHILL AND RESULTED IN A CONTINUUM OF PREJUDICE WHICH DEMANDS A NEW TRIAL?

(Appellant's Brief at 5-6).

Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. *Commonwealth v. Conway*, 14 A.3d 101 (Pa.Super. 2011), *appeal denied*, 612 Pa. 687, 29 A.3d 795 (2011). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). We give no such deference, however, to the court's legal conclusions. *Commonwealth v. Ford*, 44 A.3d 1190 (Pa.Super. 2012). Further, a petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by any further

proceedings. ***Commonwealth v. Wah***, 42 A.3d 335 (Pa.Super. 2012).

In his first and second issues, Appellant contends Detective Donald Murtha obtained two warrants to search Appellant's law office during the Commonwealth's initial investigation into the fraudulent insurance claims. Appellant asserts the affidavits of probable cause supporting the search warrants contained the following defects:

> In his affidavits of probable cause Detective Murtha failed to identify the dates on which suspected offenses were believed to have occurred, referred to incidents that happened more than five years before the warrants were sought, failed to specify the dates and times within which [the detective] obtained the information which led to his request for the warrants, failed to provide any current, recent or active information, and failed to provide evidence of any alleged criminal activity of Appellant's involvement in any unlawful activity.

(Appellant's Brief at 16-17). In light of the purportedly defective affidavits, Appellant argues trial counsel should have moved to quash the indictments against Appellant and suppress all evidence obtained as a result of the searches.[4] Appellant further argues that appellate counsel should have raised similar challenges on direct appeal. Appellant complains trial and appellate counsel did not have a reasonable basis for failing to challenge the

---

[4] In a related claim, Appellant avers the trial court improperly admitted the evidence at issue to establish a continuing course of conduct related to the charge of dealing in proceeds of unlawful activities. Appellant insists, however, dealing in proceeds of unlawful activities is not a continuing offense, and trial counsel should have challenged the admissibility of the evidence on this basis.

defective search warrants or the admissibility of the evidence obtained as a result of the searches, and counsels' failures caused Appellant to suffer prejudice. Appellant concludes trial and appellate counsel were ineffective. We disagree.

The law presumes counsel has rendered effective assistance. *Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. *Williams, supra*.

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit…." *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa.Super. 2004).

> Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate [her] client's interests. If we conclude that the particular course chosen by counsel had

some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective.

***Pierce, supra*** at 524, 645 A.2d at 194-95 (internal citations omitted).

Prejudice is established when [a defendant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In [***Kimball, supra***]*,* we held that a "criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

***Commonwealth v. Chambers***, 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002) (some internal citations and quotation marks omitted).

"In this jurisdiction, in determining whether probable cause for issuance of a warrant is present, the 'totality of the circumstances' test set forth in ***Illinois v. Gates***, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), was adopted in ***Commonwealth v. Gray***, 509 Pa. 476, 503 A.2d 921 (1985)." ***Commonwealth v. Murphy***, 916 A.2d 679, 681-82 (Pa.Super. 2007), *appeal denied*, 593 Pa. 739, 929 A.2d 1161 (2007). "Under such a standard, the task of the issuing authority is to make a practical, common sense assessment [of] whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." ***Id.*** at 682. Further, a magistrate's finding of probable cause must be based on facts described within the four corners of the affidavit. ***Commonwealth v.***

*Smith*, 784 A.2d 182 (Pa.Super. 2001).

"Under our law, the focus is on the information provided to the **issuing authority** and its response to that information." *Commonwealth v. Huntington*, 924 A.2d 1252, 1256 (Pa.Super. 2007), *appeal denied*, 593 Pa. 746, 931 A.2d 656 (2007) (emphasis in original).

> The role of the reviewing court and the appellate court is to ascertain whether the issuing magistrate appropriately determined that probable cause existed for the issuance of the warrant. Probable cause is based on a finding of probability and does not require a *prima facie* showing of criminal activity. Both the reviewing court and this Court must accord deference to a magistrate's finding of probable cause.

*Id.* (internal citations and quotation marks omitted).

"An affidavit of probable cause must include facts from which a magistrate can determine the time frame within which the supporting information was acquired." *Commonwealth v. Sharp*, 683 A.2d 1219, 1223 (Pa.Super. 1996). "A search warrant is defective if the issuing authority is not supplied with a time frame upon which to ascertain when the affiant obtained the information from the informant and when the informant himself witnessed the criminal acts detailed in the affidavit of probable cause." *Id.* "[S]tale information cannot provide probable cause in support of a warrant." *Commonwealth v. Hoppert*, 39 A.3d 358, 363 (Pa.Super. 2012), *appeal denied*, 618 Pa. 684, 57 A.3d 68 (2012) (quoting *Commonwealth v. Janda*, 14 A.3d 147, 158 (Pa.Super. 2011)). "A showing that criminal activity is likely to have continued up to the time of

the issuance of a warrant renders otherwise stale information viable."

***Commonwealth v. Jones***, 542 Pa. 418, 427, 668 A.2d 114, 118 (1995).

Additionally, "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." ***Commonwealth v. Drumheller***, 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting ***Commonwealth v. Stallworth***, 566 Pa. 349, 363, 781 A.2d 110, 117 (2001)).

> Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.

***Drumheller, supra*** at 135, 808 A.2d at 904 (quoting ***Stallworth, supra*** at 363, 781 A.2d at 117-18).

"Evidence of prior crimes or bad acts may not be presented at trial to establish the defendant's criminal character or proclivities." ***Commonwealth v. Hudson***, 955 A.2d 1031, 1034 (Pa.Super. 2008), *appeal denied*, 600 Pa. 739, 964 A.2d 1 (2009).

> The same evidence may be admissible in other circumstances, however. To be admissible, the evidence must have some purpose other than simply prejudicing the defendant. Some examples of legitimate evidentiary purposes for the introduction of evidence of other crimes or criminal behavior include: motive, intent, absence of mistake or accident, a common scheme, to establish the identity of the person charged with the commission of the other crime, to impeach the credibility of a defendant's testimony, situations where a defendant used his prior

- 11 -

criminal history to threaten or intimidate the victim, or situations where the distinct crimes were part of a chain or sequence [of] events which formed the history of the case and were part of its natural development.

*Commonwealth v. Santiago*, 822 A.2d 716, 728 (Pa.Super. 2003), *cert. denied*, 542 U.S. 942, 124 S.Ct. 2916, 159 L.Ed.2d 820 (2004) (internal citations and quotation marks omitted).

Instantly, Detective Murtha applied for the first warrant to search Appellant's office on December 1, 2005. The affidavit of probable cause included the following averments:

Your affiant is investigating a series of fraudulent insurance claims in which Nathaniel Shaw recruits individuals to participate in fraudulent insurance claims. All of the claimants have had a slip and fall type accident on a commercial property. They have then treated at an emergency room, and followed up with physical therapy. Shaw then referred them to [Appellant], who filed claims with the insurance carrier on their behalf.

Brenda Alexander, Kenneth Harrison, Lucille Hickman, Beverly Johnson, and John Whitmore either live or have lived in properties owned by Mr. Shaw. Carolyn Cottman lived with Shaw, and was involved in a relationship with him for several years. Carolyn Cottman, Shirley Cottman, and Denise Cottman are sisters.

Kenneth Harrison made a statement to…a representative of Chubb Insurance, in which he identified Brenda Alexander as his girlfriend. Harrison stated that Alexander's insurance claim was fraudulent, and set up by Nathaniel Shaw, whom he identified as his landlord. Harrison added that Shaw attempted to recruit him into a fraudulent insurance claim by telling him that all he had to do was answer a few questions, and he would get paid.

Harrison stated that Shaw provided Alexander with pictures and told her what she was supposed to do, and

- 12 -

what to say to the lawyer. Shaw later drove Harrison and Alexander to [Appellant's] office and stayed for the interview.

Harrison stated that Lucille Hickman and Beverly Johnson, also former tenants of Shaw's, had participated with Shaw in fraudulent insurance claims. According to Harrison, Hickman and Johnson both told him that Shaw set them up by providing them with pictures, and telling them what to say. Shaw also set Hickman and Johnson up with [Appellant]. According to Harrison, Shaw also told him that he had set up both Hickman and Johnson with their fraudulent insurance claim.

Your affiant interviewed Brenda Alexander. Alexander admitted that her insurance claim against Chubb was fraudulent. Alexander stated Shaw took her to see [Appellant], and that Shaw provided her with photographs and told her what to say.

[Appellant] eventually withdrew his claim on behalf of Brenda Alexander with Chubb. [Appellant] settled the claim on behalf of Beverly Johnson with Nationwide and the City of Philadelphia for $5,750.00. [Appellant] settled the claim on behalf of Lucille Hickman with Travelers for $5,000.00.

Your affiant interviewed Carolyn Cottman. Carolyn Cottman admits that her insurance claim against Chubb Insurance is fraudulent. Carolyn Cottman stated that she was involved in a relationship with Nathaniel Shaw. According to Carolyn Cottman, Shaw took her to see [Appellant]. Shaw also provided her with photographs of the insured location and told her what to say. [Appellant] settled the claim on behalf of Carolyn Cottman for $1,500.00.

Your affiant spoke to Shirley Cottman. Shirley Cottman admits to exaggerating her injuries in her claim against The Hartford. Shirley Cottman stated that Shaw took her to see [Appellant], and that Shaw took photographs of the hole in the parking lot where she alleges she actually twisted her ankle. [Appellant] settled this claim on behalf [of] Shirley Cottman with The Hartford for $1,000.00.

Your affiant reviewed claim file # P-6585 from Magna Carta Companies for a slip and fall claim involving Denise Cottman on the insured property of the Hollywood Video Store at 4333 N. Broad Street on 05-21-01. [Appellant] represented Denise Cottman in this claim. According to the file, Denise Cottman fell and injured herself due to a depressed manhole cover in the sidewalk. The claim file includes four Polaroid photos of the manhole cover. Shirley Cottman is listed as a witness to the fall. Denise Cottman treated at Temple Hospital Emergency Room and then with Dr. Richard S. Glick. [Appellant] settled this claim on behalf of Denise Cottman for $10,000.00.

Your affiant interviewed John Whitmore. Mr. Whitmore admitted that his insurance claim against Church Mutual is fraudulent. Whitmore stated that Shaw took him to see [Appellant] and sat with him while [Appellant] interviewed him. According to Whitmore, Shaw was aware that he did not injure himself at the insured property. Whitmore stated Shaw encouraged him to exaggerate his injuries in order to get a large sum of money in settlement. [Appellant] settled this claim on behalf of Mr. Whitmore for $12,000.00.

Your affiant learned that Nathaniel Shaw…had a commercial liability claim from an incident at the First Union Bank, 2627 Germantown Avenue on or about 08-26-1999. Your affiant contacted Jody Jaffry of the Special Investigation Unit of GAB Robins North America. Ms. Jaffry confirmed that her company insured First Union, and that [Appellant] had filed a claim on Nathaniel Shaw's behalf. [Appellant] settled this claim on behalf of Nathaniel Shaw for $5,500.00.

*   *   *

(**See** Amended PCRA Petition, filed 10/19/12, at Exhibit A; Appellant's Brief at Exhibit A.) Detective Murtha subsequently received a warrant to search for records related to the aforementioned insurance claims.

Detective Murtha applied for the second warrant to search Appellant's

office on February 6, 2006.  The affidavit of probable cause included the

following averments:

> On 12-05-2005, your affiant and other members of the [Philadelphia District Attorney's Insurance Fraud Unit] served Search and Seizure Warrant # 118246 at [Appellant's law office].  As a result of this search and seizure warrant numerous files, documents, and accounting cards were seized.
>
> During the search inside [Appellant's] office, Melissa Burns, an employee of [Appellant's], directed your affiant to [Appellant's] accounting cards.  These cards were stored in [Appellant's] office, in an area directly behind [Appellant's] desk and also in a cabinet in front of [Appellant's] desk.  Your affiant reviewed the accounting cards, and seized those cards that were [relevant] to Nathaniel Shaw, as outlined in Search and Seizure Warrant # 118246.
>
> Your affiant reviewed the accounting cards recovered from [Appellant's] office during the execution of the Search and Seizure warrant on 12-05-2005.  These cards reveal over 130 payments from [Appellant] to Nathaniel Shaw from 1985 to the present.  These payments, listed as fees for photographs or investigation, range from $100.00 to $1,000.00 per case, and total more than $47,000.00.  The total payments issued by the corresponding insurance carriers in these cases, as indicated by [Appellant's] accounting cards, are over one million dollars.  On the accounting cards seized, the payment to Nathaniel Shaw is generally the first item listed on the card.
>
> While searching through the accounting cards inside [Appellant's] office, your affiant noticed many additional accounting cards, which also indicated a payment to other individuals as the first entry on the card.  Several different names appeared again and again, along with payment information, on these cards.  These cards were similar to the cards indicating payments to Nathaniel Shaw, but these cards were not seized, and the names of the individuals were not recorded as they did not relate to search and seizure warrant # 118246.

- 15 -

*   *   *

On 01-03-2005, Nathaniel Shaw and his attorney…came into the District Attorney's Office and made a statement. In summary, Shaw stated he has known [Appellant] for about thirty years. Shaw went on to state that he is involved in bringing clients into see [Appellant], and [Appellant] files fraudulent insurance claims on their behalf. [Appellant] pays [Shaw] from $150.00 to $500.00 for each client. According to Shaw, [Appellant] is aware that the cases are fraudulent. In fact, [Appellant] instructed Shaw to find locations with broken concrete, missing or broken steps, or broken handrails, and then take pictures of the defect. Shaw was to then match the location up with a client and to instruct the client on where to say they fell.

*   *   *

Your affiant asked Shaw if there were others who also brought cases to [Appellant]. Shaw identified a Gerry Marshall and a Mario Westcott as bringing cases to [Appellant]. According to Shaw, Marshall told Shaw that he had referred a lot of cases to [Appellant]. Shaw stated that Westcott also stated that he referred cases to [Appellant]. In addition, Shaw stated he knew there were others, but didn't know their names.

*   *   *

(*See* Amended PCRA Petition, filed 10/19/12, at Exhibit B; Appellant's Brief at Exhibit B.) Detective Murtha subsequently received a warrant to search for records related to the other individuals who served as runners for Appellant.

The PCRA court reviewed Appellant's claims concerning the affidavits of probable cause as follows:

[V]iewed in a commonsense manner, the information

- 16 -

contained in the [first] affidavit established an ongoing course of fraudulent conduct, evidence of which could be found in the records held by [Appellant] in his law office. The affidavit established that Shaw had been engaged in repeated fraudulent insurance claims at least until January 2004,[5] that Shaw took the claimants to [Appellant's] office, and that [Appellant] had filed claims and received payment on behalf of the claimants. Since the totality of the circumstances, as demonstrated in the affidavit, established a "fair probability" that evidence of fraudulent insurance claims would be found in [Appellant's] offices, there was substantial evidence in the record to support the decision to issue the warrant.

\* \* \*

[Appellant's] claims of staleness are belied by the continuous course of conduct engaged in, as well as the nature of the records sought. The affidavit clearly details a course of conduct wherein Shaw recruited fake insurance claimants and presented those claimants to [Appellant]. The affidavit also clearly describes the events therein in the present tense, detailing past claims of only a few years earlier to support the allegation of conduct that had begun five years earlier. Finally, the affidavit avers that each of these fraudulent claims were litigated by [Appellant], who maintained business records as part of that litigation. The affidavit, therefore, did not include remote or stale allegations, as the evidence sought would be expected to be found in the business records located in [Appellant's] law office.

\* \* \*

The averments in the affidavit for the second warrant established that the incriminating evidence sought in the warrant were not only likely to be kept in [Appellant's]

---

[5] The first affidavit of probable cause stated that Shirley Cottman's purported injury occurred on January 13, 2004. The incidents precipitating the other fraudulent insurance claims mentioned in the first affidavit occurred between 2000 and 2002.

offices, but were actually known to be located there. The affidavit established that [Appellant] kept accounting records for payments made to runners other than Shaw and that there were additional files associated with those runners. Since the totality of the circumstances, as demonstrated in the affidavit, established more than a "fair probability" that additional evidence of fraudulent insurance claims would be found in [Appellant's] offices, there was substantial evidence in the record to support the decision to issue the warrant.

(*See* PCRA Court Opinion, filed July 14, 2014, at 5-8.) We agree. Although Appellant vigorously asserts that the first affidavit did not specifically allege Appellant's participation in/knowledge of criminal activity, we emphasize that the affidavit had only to establish a fair probability that evidence of a crime would be found at Appellant's office. *See Murphy, supra*. Here, the circumstances described in the first affidavit, including Appellant's clients' statements to Detective Murtha, created a fair probability that the detective would find evidence related to the fraudulent insurance claims at Appellant's office. As the search warrants were valid, all prior counsel cannot be deemed ineffective for failing to challenge them. *See Pierce, supra*; *Poplawski, supra*.

Regarding trial counsel's failure to object to the admission of allegedly improper evidence, the PCRA court noted:

> It is true that the Commonwealth's case included evidence of numerous fraudulent claims that were remote enough in time to be barred by the statute of limitations applicable to theft and insurance fraud. However, all of this evidence was clearly relevant and admissible....
>
> First, the evidence was admissible...for the Commonwealth

- 18 -

to prove necessary predicate acts for [Appellant's] corrupt organization charge.

\*    \*    \*

As the evidence objected to by [Appellant] was directly relevant to establish predicate acts constituting a "pattern of racketeering activity," a requisite element of the corrupt organization charge, [Appellant] was not unfairly prejudiced by the [admission] of such evidence.

\*    \*    \*

Finally, the evidence was admissible under Pa.R.E. 404(b) to establish that the fraudulent acts with which [Appellant] was charged were part of a common scheme or plan.

\*    \*    \*

Here, evidence of [Appellant's] past interactions with Shaw and other runners was admissible to demonstrate [Appellant's] common scheme and plan. [Appellant] utilized runners to scope out potential locations for a fraudulent accident. The same runner would then recruit an individual to claim that they had been injured in that location, whereupon the runner would take the claimant to [Appellant] for legal representation. [Appellant] would then pay the runner a fee and would file a fraudulent claim on behalf of the claimant. Upon completion of the case, [Appellant] would split the proceeds of any financial award pursuant to a fee agreement. In many instances, the only difference between the "stale acts" and the acts for which [Appellant] was convicted were the physical location of the claimed accident and the amount of money distributed. Clearly, [Appellant's] course of conduct was sufficiently similar to the conduct at issue as to be admissible as evidence of [Appellant's] common scheme and plan.

(**See** PCRA Court Opinion at 8-11) (internal citations omitted). We agree

that the trial court properly admitted the relevant evidence at issue. **See**

**Drumheller, supra**; **Santiago, supra**. Thus, Appellant's claim that trial

- 19 -

counsel should have objected to the admission of the evidence, lacks arguable merit. Therefore, Appellant is not entitled to relief on his first and second issues. ***See Pierce, supra***; ***Poplawski, supra***.

In his third issue, Appellant reiterates his allegations regarding the purportedly defective search warrants. Appellant maintains he satisfied his burden of proof in the PCRA court, because "[w]hat was required…was that the jury verdict could have been different but for the admission of the illegally obtained and stale evidence." (Appellant's Brief at 41). Appellant concludes he is entitled to a new trial on this basis. Nevertheless, we have already determined that probable cause supported the issuance of the search warrants, and the trial court properly admitted the evidence obtained through execution of the warrants. Thus, the PCRA court correctly applied the law, and Appellant's third issue warrants no relief. ***See Conway, supra***. Accordingly, we affirm the court's order disposing of Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/8/2015

- 20 -